# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0826-20

C.R.D.,[1]

    Plaintiff-Respondent,

v.

C.S.,

    Defendant-Appellant.

_____

Submitted November 8, 2021 – Decided December 7, 2021

Before Judges Rose and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-0873-21.

Mario M. Blanch, attorney for appellant.

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the parties, R. 1:38-3(c)(12), and pseudonyms for ease of reference.

Defendant C.S. appeals from a November 2, 2020 amended final restraining order (FRO) issued in favor of her ex-husband, plaintiff C.R.D., pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA). A Family Part judge entered the FRO after finding defendant committed the predicate act of simple assault, N.J.S.A. 2C:12-1(a), and N.J.S.A. 2C:25-19(a)(2), on September 13, 2020, and an FRO was necessary to protect plaintiff from future acts of domestic violence.

On appeal, defendant contends the trial judge erroneously determined plaintiff established the need for final restraints, despite concluding plaintiff instigated the present physical altercation, and failing to find defendant had previously subjected plaintiff to domestic abuse. For the reasons that follow, we vacate the FRO, reinstate the temporary restraining order (TRO), and remand for further proceedings.

I.

The facts were established at the three-day bench trial in October 2020. At the time of trial, plaintiff was remarried to R.D. (Rachel); defendant was dating S.P. (Sam). Plaintiff was self-represented. He testified on his own behalf and presented the testimony of Rachel. Represented by counsel, defendant testified on her own behalf, and presented the testimony of Sam; her adult son,

A-0826-20

J.P. (Jim); and I.S. (Isaiah), who witnessed the incident but previously was unknown to either party. Defendant also introduced in evidence a surveillance video recording of the incident, and a receipt for the repair of her damaged cellphone.

According to the undisputed trial record, the parties were married in 2008, separated in 2011, and divorced thereafter. They had one child, M.D. (Mary), born in 2010. Pursuant to the terms of a final custody order,[2] defendant was afforded parenting time on alternate weekends and certain weekdays.

By all accounts, the relationship between plaintiff and defendant was contentious. The genesis of their dispute that precipitated the filing of the present domestic violence complaint arose at the conclusion of defendant's parenting time with Mary on September 13, 2020. Not surprisingly, the parties' accounts of the incident were diametrically opposed.

Plaintiff testified that he and Rachel drove from their Perth Amboy home to pick up Mary outside defendant's home in Newark. When he was within a few blocks of the home, plaintiff called Mary, who indicated she and defendant were en route. Admittedly "upset" because defendant frequently made him wait

---

[2] The custody order was referenced in the judge's November 2, 2020 oral decision, which amended the FRO only to modify Mary's pickup and drop off location. The custody order was not provided on appeal.

A-0826-20

up to a half-hour on pickup days, plaintiff called defendant and the parties argued. Defendant arrived about fifteen or twenty minutes later and immediately yelled at plaintiff. In turn, plaintiff "said some words to her that were not nice because [he] was angry." Defendant's boyfriend, Sam, intervened and "took a posture like he wanted to fight" plaintiff. On cross-examination, plaintiff denied that he "shove[d]" Sam. According to plaintiff, everyone was "upset."

Plaintiff claimed he walked away from defendant and Sam at the behest of Rachel and Mary. But as plaintiff left, defendant "smacked [him] upside [his] head," then "across [his] face," in an attempt "to get [plaintiff] to hit [her]." Plaintiff said he "looked at [defendant] and laughed because [he] would not hit a woman, especially the mother of [his] child in front of [his] child." Defendant then shoved plaintiff, who again responded by laughing.

Undeterred, defendant retrieved a "five-foot long stick" from her car, "wound up like Reggie Jackson, and hit [plaintiff] across the chest . . . so hard [that] the stick broke." Again, plaintiff laughed. Sam grabbed the broken stick and gave it to defendant, who struck plaintiff's left knee, causing welts. Yet again, plaintiff laughed. Mary, however, was "crying hysterically."

A-0826-20

Plaintiff claimed that during the entire exchange, his "hands never left [his] side." Plaintiff, Rachel, and Mary drove off and plaintiff called the police. Defendant was arrested at the scene.

The following day, during the morning of September 14, 2020, plaintiff filed a domestic violence complaint against defendant alleging assault and harassment; a Superior Court judge issued a TRO. According to the complaint: "There is an open case with DCP&P";[3] "def[endant] has mental issues"; and she "is verbally abusive."

In response to the judge's inquiry as to whether "defendant causes [plaintiff] to have a concern for [his] safety or well-being," plaintiff responded: "Yes," defendant "has an inability to let things go. . . . I'm very concerned for my daughter more than myself because [defendant] has told my daughter on many occasions about things that [defendant] will do if [defendant] doesn't get her way."

Rachel's account of the September 13, 2020 events was largely consistent with plaintiff's testimony. She testified that defendant started the altercation by hurling verbal obscenities at plaintiff and struck plaintiff with a sugarcane. Rachel denied plaintiff ever pushed Sam.

---

[3] Division of Child Protection and Permanency.

A-0826-20

Defendant testified to a more descriptive account of plaintiff's "insults." She recalled being "surprised" that plaintiff "was so furious" when she brought Mary to his car, "saying bad words to [defendant]; calling [her] a fucker." Defendant continued: "In front of the child he was calling me a whore, a fucker." Plaintiff exited his vehicle and followed defendant to her car. Because plaintiff is "tall and very strong" and "his face scared [her] a bit," she attempted to call the police. But when plaintiff noticed defendant's cellphone, he "threw a punch" at her face, which "brushed against [her] nose" and knocked the phone from her hand, breaking it.

According to defendant, Sam approached the parties to determine what was transpiring. Contrary to plaintiff's testimony, defendant stated plaintiff was immediately confrontational, rhetorically asking Sam: "Do you want to have problems with me"; "what do you want, fucker?" Plaintiff then shoved Sam "with his belly." In response, defendant hit plaintiff with a sugarcane she had purchased to make a home remedy. Defendant claimed she only struck plaintiff with the sugarcane once.

Sam's testimony was largely consistent with defendant's account. Isaiah corroborated the testimony of defendant and Sam. As a few notable examples, Isaiah stated plaintiff: initiated the incident by "getting out of his car . . . going

6

towards [defendant], saying bad words to her and . . . assaulting her"; "thr[ew] a blow" at defendant, causing her to drop her phone; and yelled "obscenities" at defendant as he left the scene. Isaiah did not observe defendant slap plaintiff in the head or body. He said defendant struck plaintiff with the sugarcane, but only in an attempt "to separate [plaintiff and Sam]."

The domestic violence complaint also generally alleged a prior reported incident of domestic violence "sometime in November" 2009, when plaintiff was "assaulted" by defendant. At trial, plaintiff claimed on that occasion he tried to intervene when defendant was "beating her son." Plaintiff stated he "held [defendant] down on the bed to get her to calm down" by "lying on top of her [and] holding her arms by the wrist." In response, defendant grabbed "a clump of [his] dreadlocks and pulled it completely out," leaving a three-inch bald spot.

Jim countered plaintiff's account. Jim explained that in 2009 he was ten years old and living with the parties in Kansas City. When asked whether he "remember[ed] an incident where his [mom] was hitting [him] and [plaintiff] stepped in," Jim replied: "I do not recall." Jim added that question seemed "odd" because his "relationship with [plaintiff] was never that good."

Following summations, the trial judge rendered an oral decision, finding defendant assaulted plaintiff and that he needed the protection of a final

7

restraining order.[4]  Although the judge found plaintiff and defendant "equally inconsistent and equally swayed by their own self-serving perception of the incident," he ultimately determined plaintiff's testimony was more credible. Referencing the surveillance video – which he deemed "the most compelling piece of evidence" adduced at trial – the judge found the footage refuted defendant's claim that "her role in the fracas [was] limited to a single strike with the sugarcane."

Nonetheless, the judge "was particularly perturbed by . . . plaintiff's testimony that he never pushed [Sam,]" finding the video footage "eviscerates this claim."  Because plaintiff's wife, Rachel, testified to the same inaccuracy, the judge discredited her testimony.

Notably, the judge "found much of [Jim's] testimony either irrelevant or so dated from when it occurred" that it was "unreliable."  Accordingly, the judge did not consider Jim's testimony in his "ultimate decision."

Conversely, the judge found the limited testimony of Isaiah "particularly credible" as to plaintiff's act of "knocking the phone out of [defendant's] hand."

---

[4]  The judge did not render a decision as to the predicate offense of harassment as charged in plaintiff's domestic violence complaint.  See Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006) (recognizing only one predicate act is required to find domestic violence).

The judge found defendant's boyfriend, Sam, was "the most credible witness in this entire case," concluding Sam's "consistent and forthright" testimony "comported with what was actually captured in the video of the incident."

With those credibility findings in view, the trial judge made detailed factual findings as to the predicate act of assault. In sum, the judge found both parties "equally responsible for the escalation" of the incident. The judge initially determined defendant's use of force "was justifiable" to protect herself or Sam against plaintiff's "unlawful [use of] force" by "pushing and shoving [Sam] and knocking the phone out of . . . defendant's hand." Finding the incident "should have ended" after plaintiff finally walked away, the judge determined defendant no longer was justified in using force. Because defendant then struck plaintiff "with a two-handed swing . . . from behind," the judge concluded defendant's action "was purposeful and intended to cause bodily injury." See N.J.S.A. 2C:12-1(a)(1).

Briefly turning to plaintiff's need for the protection of a final order, the judge stated:

> [P]laintiff has met the burden as to a continuing need
> for a restraining order . . . for the reasons stated in my
> findings of fact, and because of the protections and
> remedial policy of protecting victims advanced by our
> Legislature, and because I find that a restraining order
> is necessary to protect the health, safety, and welfare of

the victim and to prevent further abuse.  Plus I find that . . . plaintiff has satisfied both prongs of <u>Silver v. Silver</u> . . . .

## II.

Our limited scope of review of a trial court's findings of fact is well established.  "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'"  <u>C.C. v. J.A.H.</u>, 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting <u>J.D. v. M.D.F.</u>, 207 N.J. 458, 482 (2011)).  "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'"  <u>MacKinnon v. MacKinnon</u>, 191 N.J. 240, 254 (2007) (quoting <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998)).

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence."  <u>Gnall v. Gnall</u>, 222 N.J. 414, 428 (2015).  We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice."  <u>Cesare</u>, 154 N.J. at 412.  We do not accord such deference to the court's legal conclusions, which we review de novo.  <u>Thieme v. Aucoin-Thieme</u>, 227 N.J. 269, 283 (2016).

The entry of a final restraining order under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If the court finds the defendant committed a predicate act of domestic violence, the court must then determine whether it "should enter a restraining order that provides protection for the victim." Id. at 126. In those cases where "the risk of harm is so great," J.D. 207 N.J. at 488, the second inquiry "is most often perfunctory and self-evident," Silver, 387 N.J. Super. at 127. In all cases, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors included in N.J.S.A. 2C:25-29(a)(1) to (6), to protect the victim from an immediate danger or to prevent further abuse." Ibid. Those factors include, but are not limited to: "The previous history of domestic violence between the [parties], including threats, harassment and physical abuse,"; "[t]he existence of immediate danger to person or property"; and "[t]he best interests of the victim and any child." N.J.S.A. 2C:25-29(a)(1), (2), and (4).

A-0826-20

In the present matter, defendant does not challenge the judge's finding that she committed the predicate act of simple assault. We therefore limit our review to the second Silver prong.

Because "the Legislature did not intend that the commission of one of the enumerated predicate acts of domestic violence automatically mandates the entry of" an FRO, the judge was required to make specific findings as to whether restraints were necessary to "protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. Here, however, the trial judge's findings on the second Silver prong were brief and limited to a general incorporation of his factual findings. Absent from the judge's terse analysis was any reference to the factors enumerated in N.J.S.A. 2C:25-29(a).

Indeed, the judge made no findings concerning the parties' previous history of domestic violence, N.J.S.A. 2C:25-29(a)(1), notwithstanding plaintiff's allegation that defendant assaulted him in 2009, when the parties were married. Notably, the judge found irrelevant Jim's testimony in that regard. Nor did the judge make any findings regarding the existence of immediate danger to plaintiff or his property here, where: plaintiff verbally instigated the altercation; laughed after each time defendant allegedly struck him; and was more concerned

12

for Mary than himself. In the absence of these findings, we are unable to review whether the second <u>Silver</u> prong was met. <u>See</u> <u>J.D.</u>, 207 N.J. at 488.

Consequently, we are constrained to vacate the FRO, reinstate the TRO, and remand the matter for further findings that focus on the second prong of the <u>Silver</u> analysis. Specifically, having found defendant committed the predicate act of simple assault, the trial judge shall "determine whether a domestic violence restraining order [was] necessary to protect plaintiff from immediate danger or further acts of domestic violence." <u>Id.</u> at 128. In remanding this matter, we do not suggest a preferred result, but only that the trial judge fully address the second <u>Silver</u> prong.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0826-20